LYDIA BUCK *v.* THE TOWN OF WORCESTER.

*Auditor.   Evidence.   Contract.*

The defendant had been paying the plaintiff $100 a year, to aid her in supporting her invalid daughter, Arabella, a pauper. The next day after the March meeting of 1871, the plaintiff went to the house of the defendant's overseer of the poor, to see what was going to be done about her daughter. The overseer offered her $25 in addition to the $100, for taking care of her daughter the then past year, and $125 for the coming year. This the plaintiff refused; but offered to take $50 in addition for the past year, and $150 for the coming year, if her daughter was no worse. Finally, after consulting with some townsmen present, the overseer drew an order for $50 on the town treasurer

in favor of the plaintiff, and handed it to her, saying, "I have accepted your offer." She took it and said, "I can't keep Arabella another year for $150 if she should be worse than she has been for the past year. If she should be worse, and require watchers, and more medicine and attention from the doctor than last year, I must have what that is worth in addition." The overseer replied, "Take your child and go home and stop your noise." Nothing more was said. At the end of three months, the overseer sent the plaintiff an order on the town treasurer for $37.50, which she refused to accept, because it was not enough, and returned it. The last of February, 1872, the plaintiff, at her request, had $75 in orders, towards keeping her daughter that year. Her daughter was worse that year, and needed and had much more medicine and care and attention from a doctor, and the necessity for watchers was greatly increased; and for this extra expense over the year before, the auditor found the plaintiff was reasonably entitled to $50 extra. From the foregoing facts the auditor found that the plaintiff agreed to keep her daughter for the then coming year for $150, only conditionally; and *inferred*, provided such inference could be legally drawn, that the overseer intended the plaintiff should have $150, absolutely, and in case her daughter was worse the then coming year than she was the year before, and needed more watchers, and medicine, and attention from a doctor, that she should have such further sum as she reasonably ought to have. *Held*, the auditor having found a *contract*, that it was not found without evidence.

At the expiration of that year, the overseer told the plaintiff he would pay her $3.50 per week for keeping her daughter another year; but the plaintiff refused to do it for that. The overseer told her he should take her away then. The plaintiff said if he did, she should go with her. Nothing more was then said about price. In May, 1872, the overseer went to the plaintiff's house, prepared to take her daughter to a place where he had contracted for her to be kept at $3.50 per week, but the plaintiff resisted, and forcibly prevented his taking her; whereupon the overseer told the plaintiff, if she prevented his taking her daughter, and kept her herself, he should pay her only $3.50 per week. Nothing more was ever said, and the plaintiff continued to keep her daughter. The auditor found that the overseer did not intend to take the plaintiff's daughter away, if she would keep her for $3.50 per week, and that the plaintiff intended, in her own mind, to keep her for that, hoping that the town would finally pay her more. *Held*, a contract for keeping the pauper at $3.50 per week from the expiration of the previous year.

BOOK ACCOUNT. Hearing on the auditor's report and exceptions thereto, at the March term, 1873, PECK, J. presiding.

The plaintiff's account was for boarding, caring for, nursing, doctoring, and clothing her daughter, Arabella Buck, from March 1, 1871, to December 26, 1872, at $10 per week. The auditor reported the following facts:

"The plaintiff has no husband, and has not had for several years. She is fifty-two years old, has resided in Worcester forty-eight years, is poor, utterly poor, dependent on her earnings for support, is a milliner, and earns, when she can work at her trade, $1.00 to $1.25 per day. She has a legal settlement in said Worcester, is the mother of six children, two of whom—Adelaide and Arabella—live with her. Arabella was nineteen years old in February, 1873, is sick, lame, helpless, and a pauper on the defendant town. She began to be ailing when about four years

of age, had a great deal of pain in one hip, and it could not be ascertained what really ailed it for nearly four years, when it turned out to be what is usually known as the *hip-ail.* When she was about eight years old, sores on the hip, gathering at the bone, began to break out, and have gone on gathering, one, and sometimes two or three, each year since, no one of which has ever been permanently healed. She has now twenty-three of them, all at times discharging matter the most purulent and offensive. She has been a terrible sufferer. The pain, when a sore is gathering, is extreme and agonizing. She is now about the size of a child of ordinary size at ten years old; her diseased hip is nearly a shapeless mass, and the limb, from the knee down, much perished and useless. The head of the diseased hip-bone and the socket are undergoing disintegration, and the thigh-bone and the bone of the pelvis are involved in this matter. She has always remained with her mother, and for quite a number of years previous to 1871, the town had given the plaintiff $100 a year to aid her in supporting this child.

"When Arabella became of age, the plaintiff applied to Cyrus Brown, overseer of the poor of the defendant town, and informed him that the town must do more in the support of Arabella for the past year, and in future, as she was growing more and more helpless, and demanded more and more time and nursing. Brown told her he could do nothing then, but at the then coming March meeting, he would bring her case before the town, and see if they would not do more; and he did so. The town at first voted to add $50 more to the previous year, and to pay her $150 for the year to come; but before the meeting closed, a vote was taken, rescinding that vote, and referring the whole matter to the overseer to do whatever he thought right in the matter. Brown was at that meeting re-elected overseer of the poor. On the day following the March meeting, the plaintiff took Arabella and carried her to Brown's house, and told him she had come to see what was to be done. Brown proposed to pay $25 in addition to the $100 for the past year, and $125 for the year to come. This proposition she refused, but would take $50 addition for the past year, and $150 for the coming year, if the girl grew no worse. This proposition Brown declined acceding to. At this period, two men, prominent in the town, came in, and Brown invited them into another room, where he and they were by themselves. Brown then told them what he had offered, and that the plaintiff declined his offer, out would take the fifty dollars additional for the past year, and would keep the child for $150 for the year to come. These men advised Brown to take up with that offer.

Thereupon, in that room, Brown wrote an order in plaintiff's favor on the town treasurer, for $50, and all three went back where the plaintiff was, and Brown handed her the order, saying, 'I have accepted your offer.' She took the order and looked at it and said to him, 'I can't keep Arabella another year for $150 if she should be worse than she has been for the past year. If she should be worse, and require watchers, and more medicine and attention from the doctor than last year, I must have what that is worth in addition.' To this Brown replied, ' Take your child and go home and stop your noise.' Brown then left the house, and the plaintiff went home with the child. At the end of three months, Brown drew an order in her favor on the town treasurer, for $37.50, and sent it to her, but she refused to take it, saying it was not enough, and the messenger carried it back to Brown. She might have had a like order each quarter, had she chose to do so, but did not. On or about the 27th of February, 1872, the plaintiff sent a written request to Brown, asking him to give an order to Mr. —— for the sum of $50, and send one to her for $25, which sum of $75 would be towards the keeping of the child that year. This is all she has received for that year, running from March, 1871, to March, 1872.

"From all the evidence on this part of the case, I do not find that the plaintiff agreed to keep the child for the year then to come, for $150, only conditionally; and from the facts stated, I infer, provided such inference may be legally drawn, that Brown intended she should have the $150, absolutely, and in case the child was worse the year coming than she had been the year preceding, and needed more watchers, more attention and medicine from the doctor, then she should have such further sum as she was reasonably entitled to, for that additional care and expense. And I find that the child was worse for the year from March, 1871, than she had been the year previous, and needed and had much more medicine, care, and attention from the doctor, and that the necessity for watchers was greatly increased, and that for this extra expense over the year before, she was reasonably entitled to have the sum of $50, making the sum of $200 that year; and deducting the $75 paid, it leaves due from the town to her, March, 1872, the sum of $125, to which is to be added one year's interest.

"If I have made an inference not warranted by the facts, as to what transpired between Brown and the plaintiff on the day before mentioned, then I find that Brown directed the plaintiff to keep the child another year, without any contract as to price, and in that case I find that the keeping of the child that year was

reasonably worth $250, and deducting the $75 paid from that, would leave due the plaintiff, March, 1872, the sum of $175, and one year's interest to be added.

"At the March meeting, 1872, Abijah Wheelock was elected overseer of the poor, and the town authorized him to settle with the plaintiff for the past year, as he thought right; also to enter into such arrangement with her for the year to come as he thought best; and in the afternoon of the day of his election, Wheelock called on the plaintiff, informed her of his official relation to her, and that he would call in a few days and make some arrangement about her child. In a short time after, he did call on the plaintiff, and offered to pay her $4 per week for the year past, deducting what pay she had received, and would also give her $4 per week to keep the child another year. The plaintiff declined to accede to the offer, thinking the sum was too small. Wheelock then went away without coming to any conclusion, but in two or three days after, again went and saw the plaintiff, and notified her that he withdrew the offer of $4 a week that he had made, and told her he would give her $3.50 per week. This the plaintiff would not take, and Wheelock told her, 'Then I shall take her away.' She replied, 'If you do, I shall go with her.' Nothing more was said about price, and Wheelock went away, not having then found any place to take the child to. He afterwards agreed with a Mr. Gould, who lived about two miles and a half from the plaintiff, and from Dr. Harris, who had charge of the child, to take her and keep her the rest of the year for $3.50 per week. Gould was as suitable a man as any one that was a stranger to the child, and to the peculiar manner in which she must be treated and cared for. Wheelock, after offering the plaintiff $3.50 per week to keep the child, did not go near her again till into May following, after the roads got dry and smooth, as he did not deem it safe for the child to be moved earlier. Between the 10th and 20th of May, Wheelock rigged a spring-bed into a wagon, and he and Mr. and Mrs. Gould went to the plaintiff's, and when he got there, he told the plaintiff that he had come to remove the child to Mr. Gould's, unless she concluded to keep her for $3.50 per week. She said she could not keep her for that, and insisted that the child should not go, as it would kill her to go to a strange place. The plaintiff and her child both grew much excited. She took the child into her lap, and told her she should not be taken from her mother. Mr Gould and wife proposed to the plaintiff to go with the child, and stay till she had taught them how to do for it. She would not consent to have the child moved. Wheelock and the plaintiff both got

very much excited. She said he should not take the child, unless he took her in pieces. He replied he would, either dead or alive. At this time, after a little lull, Wheelock told the plaintiff, 'Well, if you won't let me take the child, you shan't have a cent for keeping her,' and on that, left the house, as did the others; but after getting out doors, and advising with his townsmen, he went back into the house and told the plaintiff he would take back what he said, and that if she was a mind to accept $3.50 per week for keeping the child, she might have it. That ended the interview. Nothing more was ever said.

"I find from the evidence, that the bare moving of the child from the plaintiff's to Mr. Gould's, would not have endangered her life; but do find that, to be put to a strange place, away from her mother, and lacking her care, encouragement, and love, would have endangered the child's life. When Wheelock first saw the plaintiff on March-meeting day, he told her to keep the child till some other arrangement was made, and no other was made till he came to move the child as above stated. I also find that he did not, when he went to move the child, want or intend to do it, if the plaintiff would keep her for the $3.50 per week; and though the plaintiff admitted on her cross-examination that she did not agree to keep the child for $3.50 per week, yet, from all the testimony and circumstances, I infer that she in her own mind intended to take that sum, probably hoping that the town would finally give her more. If such inference may be legally drawn from the facts and circumstances, then I find that that price was intended to cover the time from the first Tuesday of March, 1872, to the time of auditing this case, 41½ weeks, at $3.50 per week.

"But if the court think the facts and circumstances detailed are insufficient on which to found such an inference, then I find that the plaintiff kept the child at Wheelock's request from March meeting to such time in May as would make ten weeks, and that it was reasonably worth $6.00 per week to take care of her, she being sorely afflicted by new-gathering ulcers during the time, which amounts to $60.00. From May 20th to this 27th day of December, the taking care of said child, if to be treated as on a *quantum meruit*, was worth $5.00 per week.

"The defendant's counsel insisted, and requested the auditor to find and report, that no contract for keeping the child was made in May, 1872, when Wheelock went to take it away. That question the court are at liberty to decide on the facts reported."

The court decided that the plaintiff was entitled to recover according to the finding of the auditor, for the year prior to the first

Tuesday of March, 1872, $200, less the $75 paid thereon : and that she was entitled to recover $3.50 per week for the time she kept the child after the first Tuesday of March, 1872 ; and rendered judgment accordingly.    Exceptions by both parties.

*H. W. Heaton*, for the plaintiff.*

*J. O. Livingston*, for the defendant, cited *Aldrich* v. *Londonderry*, 5 Vt. 441 ; *Castleton* v. *Miner et al.* 8 Vt. 209 ; *Houghton* v. *Danville*, 10 Vt. 537 ; *Worcester* v. *Ballard*, 38 Vt. 60 ; *Eliacon* v. *Henshaw*, 4 Wheat. 225, 228 ; *Ocean Ins. Co.* v. *Carrington*, 3 Conn. 362 ; 2 Kent Com. 639 ; *McKinley* v. *Watkins*, 13 Ill. 140 ; Addison Cont. 21, *et seq. ;* Story Cont. § 378 ; 1 Parsons Cont. 399 ; *Tucker* v. *Woods*, 12 Johns. 190 ; *Keep et al.* v. *Goodrich*, Ib. 397, 400.

The opinion of the court was delivered by

REDFIELD, J.   This action was book account, and was heard on the report of the auditor.   The plaintiff's daughter was a charge on the defendant town.   The auditor has found, after giving a history of the case in detail, that the plaintiff agreed, conditionally, to keep the pauper for the year ending March, 1872, for $150, if her condition remained the same ; but if she should require more attention, nursing, and doctoring, then the plaintiff must have additional compensation ;   that the overseer left the pauper in the plaintiff's care and custody during that year, and intended to comply with plaintiff's proposition, and pay her the $150, and such further compensation as should be reasonable, if the pauper should become worse.   She did become worse, and the enhanced expense thereby of taking care of her, was $50, making in all for that year, $200.   The auditor reports that the plaintiff insisted upon the increased compensation in the contingency which did occur ; and the overseer, allowing the pauper to remain in the custody and care of the plaintiff, is presumed to have assented to the plaintiff's proposition.   The auditor having

* The plaintiff's brief was not furnished the reporter.

found a *contract*, we do not feel warranted in declaring that it is found without evidence.

II.   The court below, upon the facts reported by the auditor, allowed the plaintiff to recover for the last forty-one and a half weeks, $3.50 per week, as upon a *contract* for that price.   The defendant insists that the plaintiff may recover $6 per week for ten weeks, up to the time, in May, 1872, when the overseer, Wheelock, with Mr. Gould and wife, undertook to remove the pauper to Mr. Gould's, who had contracted to support and care for the child for $3.50 per week.   The plaintiff resolutely resisted, and prevented the removal of the child to Mr. Gould's.   The over- seer then told the plaintiff that, as she resisted his taking the custody of the child, " she should not have a cent for keeping her."   The overseer, after leaving the house, seemed to think his language hasty and inconsiderate, and immediately went back into the house, and told the plaintiff " he would take back what he had said, and if she was a mind to accept of $3.50 per week for keeping the child, she might have it.   That ended the interview." And the auditor, " from the testimony and circumstances, infers that the plaintiff, in her mind, intended to take that sum, probably hoping that the town would finally give her more."   The law casts the duty upon the overseer to support the poor, and he has the correlative right to the control and custody of their persons and effects.   But this, like all general rules, must have its excep- tions.   The auditor finds that Mr. Gould and wife were as suita- ble persons to take charge of the child, as any strangers, and that " to put the child to a strange place, away from her mother, and lacking her care, encouragement, and love, would have en- dangered her life ;" yet, " the moving the child from the plain- tiff's to Mr. Gould's would not endanger her life."   While the overseer has the *right* to the custody of the pauper, he must ex- ercise that right in reasonable deference to the laws of humanity and decency.   If he should attempt to remove his ward at a time, and in a manner, that life would thereby be endangered, without any overruling necessity, or to treat a delicate woman in such manner as to shock the common sentiments and feelings of mod- esty and propriety, he ought not to complain if resisted.   And

there are many cases where the town *must* take charge of the poor where they are found ; and, if unable to agree, must submit to a *quantum meruit* as the rule of compensation. But these are exceptions arising from the necessity of the cases. We do not discover that the provision of the overseer in this case, was not ordinarily humane and provident. The girl could be removed without serious detriment ; and the preparation for her removal was, evidently, prompted by considerate kindness.

The *opinion* of the auditor, " that to be put to a strange place, away from her mother, and lacking her care, encouragement, and love, would have endangered the child's life," is, necessarily, speculative. Persons afflicted with disease of any kind, and of all ages, sexes, or conditions, are taken to the hospital, and estranged from parental care, that they may receive the benefit of trained nurses and the appliance of better treatment ; and this is deemed humane, and an advance in civilization. The conflict of opinion between the parties was not unnatural. Maternal love and tenderness, made keenly sensitive by continued care and sympathy with affliction, " had the mastery " of the plaintiff. And this we do not deem a fault. But we think the rights and duties of the parties in this case, are not to be determined by any imputed misconduct of either.

The sole inquiry as to this branch of the case is, was there a contract as to the compensation ? The town insisted that plaintiff must keep the child for $3.50 per week, or allow her to be supported elsewhere. The plaintiff declined the former, and *resisted* the latter. The overseer then notified her that if she forcibly retained the child, she could have no remuneration. Whether the plaintiff could recover any compensation after this date, if the case ended here, we do not determine. But the overseer went back, took back what he had said, and told her " if she was a mind to accept $3.50 per week for keeping the child, she might have it ;" and she kept the child. This was an offer not refused. She continued to perform the service without notice that the offer was rejected. It is true that she had before rejected the same offer, but the relation of the parties had become changed. The overseer chose to revoke his declaration, and then renewed his

offer. When compensation is offered as the inducement for service, and the service is performed, it is, ordinarily, the most conclusive acceptance of the offer. Had the plaintiff *claimed* the compensation offered, in this case, the town would have had a very awkward defense. The only embarrassment arises from the fact that plaintiff testifies that " she did not *agree* to keep the child for $3.50 per week," yet " in her own mind intended to take that sum." But the defendant town had the right to understand that, by performing the service, she acquiesced in the offer ; and there being no notice to the contrary, it was an acquiescence in, and assent to, the offer. And if that be so, it was support furnished at the " *request* " of the town.

We find no error in this branch of the case, and the judgment of the county court is affirmed. .